James D. DiPasquale, #011033
DIPASQUALE & SUMMERS, LLP
841 Bishop Street, Suite 1610
Honolulu, Hawaii 96813
Telephone: (808) 240-4771
Email: james@ds-lawoffices.com

Attorney for Plaintiff
MERCHANT PAYMENT SOLUTIONS, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MERCHANT PAYMENT SOLUTIONS, LLC, a Hawaii Limited Liability Company,<br><br>          Plaintiff,<br><br>     v.<br><br>WEST PAYMENTS, LLC, a Texas limited liability company; TRIO TECHNOLOGIES, LLC, a Nevada limited liability company dba TRIO PAYMENT SYSTEMS; RICKY BEARD, an individual; FFS DATA CORPORATION, a Texas corporation, OLAN BEARD, an individual; CML MANAGEMENT SERVICES LLC, a Texas limited liability company; CYNTHIA LAMBERT, an individual, and DOES 1-10 inclusive,<br><br>          Defendants. | Civil No. 23-CV-438<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**COMES NOW** Plaintiff MERCHANT PAYMENT SOLUTIONS, LLC, a

Hawaii limited liability company (hereinafter, "MPS"), files Plaintiff's First

Amended Complaint for Damages and Demand for Jury Trial complaining of

Defendants WEST PAYMENTS, LLC, a Texas limited liability company (hereinafter, "West"); TRIO TECHNOLOGIES, LLC. a Nevada limited liability company doing business as TRIO PAYMENT SYSTEMS (hereinafter, "Trio"); RICKY BEARD, an individual (hereinafter, "RB"); FFS DATA CORPORATION, a Texas corporation (hereinafter, "FFS"), OLAN BEARD (hereinafter, "OB"); CML MANAGEMENT SERVICES, LLC (hereinafter, "CML"), a Texas limited liability company; CYNTHIA LAMBERT a/k/a "CINDY LAMBERT" (hereinafter, "Ms. Lambert");  and DOES 1-10, inclusive (hereinafter, referred to as "DOES", and together with West, Trio, RB, FFS, OB, CML and Ms. Lambert, collectively referred to as "Defendants") asserting causes of action for damages. In support, Plaintiff would respectfully show the Court the following:

## I. PARTIES

1.      MPS is a limited liability company organized and existing under the laws of the State of Hawaii, with its principal offices located at 745 Fort Street, Suite 2121, Honolulu, Hawaii.

2.      Defendant West is a limited liability company organized and existing under the laws of the State of Texas, with its principal offices located at 500 Chestnut Street, Suite 1735, Abilene, Texas. Upon information and belief, it is a mere shell and naked framework used as a conduit for the conduct of FFS's, Trio's, RB's, OB's, CML's, and Ms. Lambert's business activities.

3. Defendant Trio is a limited liability company organized and existing under the laws of the State of Nevada, with its principal offices located at 500 Chestnut Street, Suite 1735, Abilene, Texas.

4. Defendant RB is a natural person and is a resident of Taylor County, Texas. RB is the owner, partner, and/or chief executive officer of both West and Trio, and, upon information and belief, RB is also an owner, partner, and/or agent of FFS.

5. Defendant FFS is a corporation organized and existing under the laws of the State of Texas, with its principal offices located at 500 Chestnut Street, Suite 1730, Abilene, Texas. Upon information and belief, FFS also maintains or has utilized offices located at 325 Hickory Street, Abilene, TX, and 3385 Noth 3rd, Suite 14, Abilene, TX.

6. Defendant OB is a natural person and is a resident of Taylor County, Texas. OB is an owner, partner, and/or President of FFS, and, upon information and belief, OB is also an equitable owner, partner, and/or agent of West, as well as Trio.

7. Defendant CML is a limited liability company organized and existing under the laws of the State of Texas, with its principal office located at 3260 FM 603, Clyde, TX. Upon information and belief, this is Co-Defendant Ms. Lambert's last known home address. Upon further information and belief, CML is a mere shell and naked framework used as a conduit for the conduct of West's, FFS's, Trio's,

RB's, OB's, and Ms. Lambert's business activities.

8.     Defendant Ms. Lambert is a natural person and is a resident of Callahan County, Texas. Ms. Lambert is an owner, partner, and/or sole member of CML, and, upon information and belief, is also an employee and/or agent of OB, RB, West, Trio, and FFS.

9.     Plaintiff is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein as Does 1 to 10, inclusive, and therefore sues defendants by such fictitious names. Plaintiff will amend this Complaint to show the true names and capacities of the fictitiously named Doe Defendants when Plaintiff ascertains same (hereafter Individual Defendants, Corporate Defendants, and Does 1 to 10, shall be referred to collectively as "Defendants.")

10.     Plaintiff is informed and believes, and on that basis alleges that at all material times, each of the Defendants, as well as Does 1 through 10, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

11.     Plaintiff is informed and believes, and based thereon alleges, that: (a) there existed and now exists a unity of interest, ownership, and operation between each Individual Defendant and the Corporate Defendant that they respectively own and control as alleged above such that the individuality and separateness of the Individual Defendants and Corporate Defendants has ceased or never existed; and (b) their failure to disregard the separate corporate entity would sanction a fraud or promote injustice. Plaintiff is further informed and believes, and based thereon alleges, that recognition of the privilege of the separate existence of the Individual Defendants from their respective Corporate Defendant would promote injustice because Individual Defendants, and each of them, in bad faith dominated and controlled Corporate Defendants and each other by the following:

a.     They have been and/or are now a mere shell and naked framework which they have used as a conduit for the conduct of their business, property, and affairs;

b.     They commingled funds and other assets of each other with their own funds and other assets for their own convenience and to assist in evading obligations;

c.     They used funds for something other than corporate uses;

d.     They purported to, and did, work through each other during the negotiations and performance, and interpretation, of the contracts and services set

forth herein;

e.     They used each other as mere shells, instrumentalities and/or conduits for their own actions, and negotiated the terms of the subject contracts and/or individually changed and/or breached the contracts for their own benefits and/or diverted funds, customers, and other assets of each other for other than corporate uses and/or to defraud MPS and others;

f.     They treated the assets of each other as their own;

g.     They failed to maintain minutes and/or adequate corporate records of each other, created confusion of the records of the separate entities, and/or failed to maintain other corporate formalities;

h.     They failed to maintain arm's length relationships among each other;

i.     They used each other to procure labor, services, or merchandise for the other;

j.     They used the same directors and officers of each other;

k.     They used the same office or business location;

l.     They employed the same employees, agents, and/or attorneys; and,

m.     Other representations, acts, or omissions subject to proof.

## II. JURISDICTION AND VENUE

12.     MPS incorporates by reference paragraphs 1 through 11 above as if set forth fully herein.

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as complete diversity of citizenship exists between Plaintiff and Defendants and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

14.     This Court's jurisdiction over this case is proper with this Court because the non-resident Defendants of this case consented to the jurisdiction of Hawaii through the Agreement at issue herein, the parties are currently, or have in the past, conducted business in Hawaii, the acts or omissions giving rise to this lawsuit occurred, at least in part, in Hawaii, and the damages and other relief sought are within the jurisdictional limits of this Court.

15.     Venue is proper in this case under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Hawaii.

16.     Furthermore, venue is proper with respect to FFS because it consented to the exclusive venue of this Court under Section 23 of the Agreement at issue hereto.

## III. <u>NATURE OF THE ACTION</u>

17.     MPS brings this action to remedy harm caused by Defendants' breaches of their contractual obligations set forth under the Merchant Payment Solutions Referral/Revenue Agreement (hereinafter, the "FFS Agent Agreement") and the Agent Agreement (hereinafter, the "West Agreement," and when referred to collectively with the FFS Agreement, the "Agent Agreements").

18.     These certain Agent Agreements arose after years of friendship and familiarity with each other in the electronic payment processing industry.

19.     Despite this, Defendants actively engaged in a common plan or scheme to deceive MPS and withhold MPS's Residual Income generated from the Merchants it referred to Defendants under the Agent Agreements.

20.     MPS now seeks to recover the several hundred thousand dollars for Defendants' common plan or scheme to breach their respective Agent Agreements and willfully withhold MPS's Residual Income related to the processing activity of Merchants referred to them thereunder.

## IV. <u>FACTUAL BACKGROUND</u>

### A. *The Electronic Payment Processing Industry and MPS's Business Operations Therein*

21.     To accept card payments, merchants must first open a "merchant account" for payment processing services with a payment processor/acquirer

("Acquirer") and a member bank ("Bank") that is contracted with such payment card brands as Visa USA, Inc. ("Visa"), Mastercard International, Inc. ("MasterCard"), Discover Financial Services, LLC, American Express and/or other networks (collectively the "Payment Brands"). Such Acquirers have direct agreements with the Payment Brands that enable them to process payments made by consumer holders of debit and credit cards ("Payment Cards") which are issued by banks affiliated with the Payment Brands and allow a consumer to purchase goods and services from merchants which contract directly with Acquirers for merchant processing services. Merchants need an Acquirer in order to accept a consumer's Payment Card.

22.  Acquirers, in turn, may contract with third-party organizations that provide payment-processing-related services (referred to in the MasterCard rules and hereinafter as "Program Services") to merchants under the Acquirer's sponsorship with the Payment Brands (such third-party organizations are referred to in the Visa rules as "Third Party Agents," and in the MasterCard rules and hereinafter as "Service Providers").

23.  The Payment Brands set forth their own rules and regulations, titled the "Card Brand Rules." The Card Brand Rules govern Service Providers, Acquirers, and merchants alike. The Banks and Acquirers have also established their own

COMPLAINT AND DEMAND FOR JURY TRIAL

internal rules and procedures that similarly govern their participation and involvement with individuals and entities concerning electronic payments.

24.     Defendants West and FFS are Service Providers. Service Providers are categorized by the Payment Brands based on the nature of the Program Services it performs. For example, an Acquirer may sponsor a Service Provider as an Independent Sales Organization ("ISO") to solicit merchants for Program Services on its behalf (which can include application processing, customer service, and statement preparation, among other services).

25.     The Acquirer is entirely responsible for, and must manage, direct, and control, all aspects of its Program Services performed by Service Providers, and it must establish and enforce all management and operating policies of its Program Services in accordance with the Card Brand Rules. An Acquirer must not transfer or assign any part of such responsibilities, or in any way limit its responsibility, with regard to any of its Service Providers. An Acquirer must conduct meaningful monitoring of its Service Providers to ensure ongoing compliance by its Service Providers with the Card Brand Rules. *See, e.g.*, MasterCard Rule 7.2.1 (Customer Responsibility                            and                            Control), https://www.mastercardservices.com/en/solutions/mastercard-geographic-insights-platform-terms-and-conditions-merchants#:~:text=7.2.,forth%20in%20the%20Product%20T%26Cs.

COMPLAINT AND DEMAND FOR JURY TRIAL

26.     As Service Providers, West and FFS are registered with the Card Brands as third-party agents of an Acquirer, which means they are:

a.     Authorized to broker MPAs to Merchants to allow them to accept electronic payments from their customers to be authorized and processed by the Payment Processor and settled to a Merchant's deposit account by the Member Bank; and

b.     Charge certain fees and rates for Card payment processing services by the Service Providers that West is authorized to mark those fees up and charge additional fees to Merchants related to such services. West's share of the revenue created from a Merchant's use of the services is known as "Residuals" or "Residual Income."

27.     As here, Service Providers frequently work with independent sales agents for recruiting and boarding merchants.

### B. ACH Processing with FFS

28.     In or about late 2018, MPS began processing automated clearing house (hereinafter, "ACH") transactions with FFS, which was established through the course of dealing between the MPS and FFS. Thereafter, on or about February 25, 2020, MPS and FFS agreed to a certain Merchant Payment Solutions Referral/Revenue Agreement attached hereto and incorporated herein as Exhibit A (the "FFS Agreement").

29.     Pursuant to the FFS Agreement, FFS introduced MPS to "new Banking

Partners for MPS to process ACH, Echecks, Pre-paid, and Debit card Transactions

for Installment Lenders."

30.     Importantly, pursuant to the FFS Agreement, Defendants agreed to the

following terms contained therein:

- *7. Termination of Agreement.* A party shall be deemed in default ("Default") of this Agreement if said Party or any of its representatives:

  (a) is convicted of any crime or offense; (b) fails or refuses to comply with the written, commercially reasonable policies and/or directive(s) of the other Party, provided such policies and/or directive(s) are consistent with and in keeping with the general scope of the Credit and Debit Card program; (c) is guilty of material misconduct in connection with performance hereunder; or (d) materially breaches provisions of this Agreement or fails to perform any of its obligations required hereunder.

- *8. Indemnification.*:

  Each Party agrees to defend, indemnify and hold harmless the other Party and the other Party's employees … from any and all claims of whatsoever nature filed in connection with this Agreement by any third party or parties. Claims may include, but are not limited to, demands, causes of action, fines, injunctions and liabilities (singly and collectively "Claims") and all reasonable expenses incurred in investigating and defending such Claims (including reasonable attorneys' fees) arising out of any Claims, where such Claims are based in whole or in part on actions taken by either Party in connection with this Agreement.

31.     With respect to the foregoing obligations, MPS and Defendants

acknowledged, among other things, that "any legal suit, action or proceeding arising

COMPLAINT AND DEMAND FOR JURY TRIAL

out of or related to this Agreement shall be instituted exclusively in the First Circuit Court of the State of Hawaii."

32.     While working with FFS, MPS was a high-performing agent and boarded several approved Merchants with high sales volume with West, including but not limited to Tribal and Non-Tribal Lenders, as well as Coyni and Greenbox POS/Quick Card.

### C. 2019 Agreement with West

33.   On or about October 28, 2019, MPS entered into a certain Referral Agreement attached hereto and incorporated herein as Exhibit B (the "West Agreement"). Pursuant to the 2020 Agreement, MPS was authorized to refer prospective merchants to West to apply for credit card processing services. If a merchant application was approved by West and the merchant used West's credit card processing services, Defendants were entitled to payments related to the Residual Income on active merchant accounts submitted by Defendants over time.

34.   Defendants West, RB, FFS, OB, and Does acted in concert with each other, with a common purpose and in combination and cooperation to perform under the Agent Agreement, and subsequently in breach of the Agreements.

35.   Importantly, pursuant to the West Agreement, Defendants agreed to abide by the following terms contained therein:

- *15. **Default***: Defendants acknowledged and agreed that, among other things, Each of the following will constitute an Event of Default:

  a. Any party fails to pay the other when due any amount due under this Agreement and such failure continues for a period of 30 business days after written notice has been sent to the non-paying party …

  d. Either party fails to observe any material obligation specified in this Agreement, and such failure is not cured within 30 days of receipt of written notice thereof from the non-breaching party.

- *16. **Certain Post-Termination Rights***: Defendants acknowledged and agreed that, among other things, Each of the following will constitute an

Event of Default:

b. Upon termination of this Agreement for any reason other than due to AGENT's willful violation of this Agreement or breach of this Agreement, WEST will continue to pay to AGENT as full compensation for AGENT continuing to service any Merchant, any residual base commissions in excess of WEST's fees and other charges as set forth until each such Merchant agreement is terminated.

- ***20. Assignability, Sale or Merger of the Parties***: "WEST may assign its rights under this Agreement provided that any assignee will take subject to all of the obligations of WEST. WEST will notify AGENT of an assignment within 60 days after the date of the assignment.

36.     With respect to the foregoing obligations, MPS and Defendants acknowledged "the exclusive forum and venue for the adjudication of any rights, claims or disputes arising out of or in connection with this Agreement shall be the federal or state courts in Taylor County, Texas."

37.     While working with West, MPS was a high-performing agent and boarded several approved Merchants with high sales volume with West, including but not limited to Coyni and Greenbox POS/Quick Card.

## D. Defendants Acted in Concert

38.     In dealing with MPS, the Defendants, and each of them, acted as a single conspiratorial unit such that each should be individually liable for the acts and omissions of each other, and that each should be subject to equitable relief for the same.

39.     Defendant West is a sub-provider of Processing Services for FFS and is a mere shell, instrumentality, and/or conduit for RB, OB, and Does own actions. For example:

(a)     OB and RB are father and son;

(b)     West and FFS utilize the same office building for their principal

COMPLAINT AND DEMAND FOR JURY TRIAL

places of business;

(c)     West and FFS utilize and/or share the same employees, including but not limited to Ms. Lambert;

(d)     RB maintains another corporate entity, Trio, which utilizes the same principal place of business as West (500 Chestnut Street, Suite 1201, Abilene, TX), and RB utilizes his "@triopay.com" email address in communications and other dealings on West's behalf;

(e)     West does not maintain its own independent website nor does it maintain any active email accounts; instead, Westpayments.com is a landing page, and the only email account service@westpayments.com is utilized by RB, who, then using his ricky@triopay.com email address, forwards the information made and contained in the emails service@westpayments.com receives to RB's own agents, including but not limited to OB and employees that West shares with Trio and FFS, such as Cynthia "Cindy" Lambert;

(f)     Upon information and belief, both OB and RB have ownership and/or equity interests in West and Trio; and

(g)     Trio, FFS, RB, OB, CML, Ms. Lambert, and Does purported to, and actually did, work through West during the negotiations and performance, and interpretation, of the Agent Agreement.

40.     Defendants RB, OB, Ms. Lambert and Does were active participants

dealing with and working with MPS as well as in the breaches of the Agreement with MPS and the misappropriations of MPS's earned commissions, residuals, and/or other types of compensation.

41.     Defendants, and each of them, acted with a common bad faith objective and an apparent attempt to deceive MPS and conceal their intentions to withhold MPS's Residual Income.

42.     The West Agreement lists West in the introductory paragraph, and RB executed it on behalf of West as its Chief Executive Officer. On the other hand, the FFS Agreement lists FFS in the introductory paragraph, and OB executed it on behalf of FFS as its President.

43.     Despite the language in the respective Agent Agreements, as explained in paragraph 40, upon information and belief, there is no separation between these two entities (FFS and West), and West is a mere shell of FFS. Specifically, despite section 20 of the West Agreement requiring notice of an assignment of rights thereunder, and despite never receiving such notice of an assignment of the rights prescribed under either of the Agent Agreements, West, at some time, assigned its rights under its Agent Agreement to FFS without providing notice to MPS.

44.     Specifically, among other things elaborated upon below, MPS began receiving Residuals from FFS, not West, in or around November 2021.

45.     Ms. Lambert communicated with MPS on FFS's behalf and West's

behalf while using her "@ffsdatacorp.com" email address in communications and other dealings on West's behalf.

46. CML communicated with MPS on West's behalf and FFS's behalf while using Ms. Lambert's "clambert@ffsdatacorp.com" email address.

47. Similarly, OB communicated with MPS on West's behalf and FFS's behalf while using his "obeard@ffsdatacorp.com" and "olanbeard@yahoo.com" email addresses.

**E. Defendants' Breaches of the Agreements and Fraudulent Trade Practices**

48. Pursuant to Section 15(a) of the West Agreement, Defendants were required to pay MPS "when due any amount under [the] Agreement." Failure to pay 30 business days after written notice constitutes an Event of Default.

49. Pursuant to Section 16(b) of the West Agreement, MPS is and was entitled to continued compensation for "continuing to service any Merchant, any residual base commissions in excess of WEST's fees and other charges."

50. Defendants, and each of them, were aware of the positive reputation and goodwill MPS possessed in Hawaii and the broader Merchant Processing industry. Defendants, and each of them, were similarly aware of the existing contractual relationships MPS had with third parties in the Merchant Processing industry.

51. Defendants, and each of them, desired to utilize MPS as a conduit to

COMPLAINT AND DEMAND FOR JURY TRIAL

grow their own business connections in the Merchant processing industry and establish connections with MPS's already existing contractual relationships with third parties. As a result, Defendants, and each of them, conspired to pursue a relationship with MPS with the intent to injure its reputation, undercut MPS from its duly owed residual compensation, and deceive MPS into thinking it would receive the full extent of the bargain to which it intended to contract into through the Agent Agreements.

52.     Defendants, and each of them, made false representations regarding their business practices, including, among other things, West's and FFS's underwriting practices, their respective requirement to provide MPS with notice before an assignment of rights, their history of timely payments to their agents, and the existence of West and FFS as separate entities (despite the father-son relationship). These misrepresentations, actions, and/or failures to act were intentional, with the purpose of inducing MPS into what it reasonably believed would be a mutually profitable relationship, and these misrepresentations, actions, and/or failures to act violate the spirit of H.R.S. § 480-2 or offend other generally accepted public policies of the State of Hawaii, as well as other generally applicable federal laws that prohibit unfair competitive practices.

53.     Defendants, and each of them, made these misrepresentations, acts, and/or omissions knowing they were likely to mislead MPS, under the

circumstances, into entering into the Agent Agreements.

54.     During the course of MPS's Agent Agreements with West and FFS, MPS consistently referred a broad range of merchants to West for merchant processing and FFS for ACH processing. These merchants include, but are not limited to, Tribal Lending Services, Non-Tribal Lending Services, Greenbox POS, Coyni, and Quick Card. Throughout the length of the Agent relationships with West and FFS, both West and FFS employed poor underwriting, which cost MPS monthly residuals amounting to nearly $400,000.00 lost per month in prospective economic advantages.

55.     In or about November 2022, FFS entered into a certain Asset Purchase Agreement with a third party to which MPS's Merchants, including but not limited to Quick Card and Coyni, were subject to. However, at no point did MPS receive notice of any assignment of rights or responsibilities under either Agent Agreement.

56.     In or about January 2023, Defendants failed to pay MPS its Residuals generated from December 2022, which was due under the terms of the Agreement in the amount and withheld not less than $193,593.25.

57.     After this failure to pay, MPS was confused by the assignment of rights without notice and the nonpayment of Residuals. As such, MPS contacted OB, who informed MPS of the Asset Purchase Agreement and deflected responsibility for the nonpayment to FFS's successor in interest.

COMPLAINT AND DEMAND FOR JURY TRIAL

58. At the request of MPS, on or about February 7, 2023, FFS's successor in interest in the Residual Income generated from MPS's Merchants requested the Acquirer to release MPS's Residuals and just compensation.

59. On or about February 22, 2023, the Acquirer informed FFS's successor in interest that OB and FFS did consent to the release of MPS's Residuals and just compensation.

60. After the February 22, 2023, email, MPS realized it had been deceived by Defendants and discovered West and FFS shared many relationships, including, among other things, shared employees and the same office building.

61. On or about March 7, 2023, MPS contacted the Acquirer and, again, requested a release of its Residuals and just compensation.

62. On or about March 8, 2023, OB informed MPS that FFS would not consent to a release of MPS's Residuals and just compensation.

63. To date, Defendants have not paid MPS its residuals in the amount of $193, 593.25 not including interest, punitive damages from Defendants' willful, reprehensible conduct, or any other applicable penalties.

## V. <u>CAUSES OF ACTION</u>

### *1. Breach of Contract*

### (Against Defendants West and FFS)

64. MPS repeats, realleges, and incorporates by reference the paragraphs

above with the same force and effect as if fully set forth herein.

65.     To establish a breach of contract, a plaintiff must show the following:

(a)     The existence of a valid, enforceable contract;

(b)     Plaintiff's performance or excuse for nonperformance;

(c)     Defendant's breach; and

(d)     Damages to plaintiff as a result of that breach.

66.     A valid, enforceable contract existed between MPS and West because West entered into the West Agreement with MPS for MPS to refer Merchants to West.

67.     A valid, enforceable contract also existed between MPS and FFS because MPS entered into the FFS Agreement with FFS for FFS to, among other things, refer financial institutions to MPS.

68.     To date, Defendants have not paid their remaining balance for the Residual Income MPS earned under the terms of the contracts.

69.     As a result of Defendants' breaches of the Agent Agreements, MPS suffered damages in an amount of no less than $193,593.25, or an amount to be determined according to proof at trial, plus attorneys' fees and costs.

## *2. Breach of Duty of Good Faith and Fair Dealing*

### (Against All Defendants)

70.     MPS repeats, realleges, and incorporates by reference the paragraphs

above with the same force and effect as if fully set forth herein.

71.     To establish a breach of the implied covenant of good faith and fair dealing, a plaintiff must show:

(a)     The defendant owes the plaintiff a duty to act in good faith and conduct fair dealing;

(b)     The defendant breached that duty; and

(c)     The defendant's breach of that duty proximately caused damages to the plaintiff.

72.     The implied covenant of good faith and fair dealing is implied within every contract. Because Defendants entered into the Agent Agreements with MPS, Defendants, and each of them, owed MPS a duty to act in good faith and deal fairly in the execution and performance of the Agent Agreements.

73.     Defendants, and each of them, breached its duty to act in good faith to MPS by intentionally withholding the Residuals generated and related compensation owed to MPS from the processing activity of the merchants MPS referred to Defendants under the Agent Agreements, despite MPS's performance in delivering said merchants to Defendants, thereby depriving MPS of the benefits which it reasonably expected.

74.     In breach of the material terms of both Agent Agreements, Defendants transferred their rights under the Agent Agreements to another company without

COMPLAINT AND DEMAND FOR JURY TRIAL

providing notice to MPS thereto. After said transfer, Defendants failed to make the December 2022 Residuals payment to MPS of which they were responsible for.

75.     As a result of Defendants' breach, MPS suffered damages in an amount of no less than $193,593.25, or an amount to be determined according to proof at trial, plus attorneys' fees and costs.

### *3. Breach of Fiduciary Duty*

### (Against Defendants RB and West)

76.     MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

77.     A breach of fiduciary duty occurs where:

(a)     The defendant owed a fiduciary duty to the plaintiff;

(b)     The defendant negligently or intentionally failed to act in good faith and for the benefit of the plaintiff or failed to use reasonable care in carrying out the fiduciary duties owed to the plaintiff; and

(c)     The defendant proximately caused injuries to the plaintiff, benefitted from the breach, or received fees or other compensation from the plaintiff.

78.     A relationship may give rise to a fiduciary duty through either a formal fiduciary relationship or an informal or confidential relationship that gives rise to a fiduciary duty on the case's facts.

79.     Defendants RB and West owed formal and informal fiduciary duties to

MPS as their status as principals in an agency relationship with MPS and as a result of the trust and loyalty MPS placed in RB and West.

80.     Texas courts have applied a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure. As parties with separate responsibilities in the same transactions, Defendants RB and West also accepted a fiduciary role with MPS to disclose all material facts related to those transactions.

81.     Defendants RB and West breached those duties by embezzling funds and putting their own self-interest ahead of MPS's interests.

82.     As a result of Defendants RB's and West's actions, MPS has been harmed in an amount to be determined according to proof at trial, plus attorneys' fees and costs.

### *4. Participation-in-Breach-of-Fiduciary Duty*

### **(Against Defendants Trio, OB, FFS, CML, and Ms. Lambert)**

83.     MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

84.     Aiding and abetting the breach of fiduciary duty occurs where:

(a)     There has been a breach by a fiduciary of obligations to another;

(b)     That the defendant knowingly induced or participated in; and

(c)     The plaintiff suffered damages as a result of the breach.

85. A defendant knowingly induces or participates in the breach of fiduciary duty when the defendant knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other nonetheless.

86. Defendants Trio, OB, FFS, CML, and Ms. Lambert knowingly induced RB and West to breach the formal and informal fiduciary duties that they owed to MPS as principals in an agency relationship. OB knowingly benefitted from money taken by RB and West in breaching their fiduciary duties. RB and West knowingly and wrongfully withheld $193,593.25 from MPS at the direction of and to the benefit of OB and FFS.

87. As a result, OB and FFS are joint tortfeasors with RB and West, and they are liable as such.

88. MPS has been harmed as a result of OB and FFS's actions. In addition to actual damages, OB and FFS should disgorge all profits and distributions they have received as a result of their wrongful actions.

### 5. Civil Fraud/Deceit

### (Against All Defendants)

89. MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

90. Civil fraud occurs where the defendant:

COMPLAINT AND DEMAND FOR JURY TRIAL

(a)     Made a misrepresentation through either;

        (i)     a positive assertion;

        (ii)    a concealment calculated to deceive; or

        (iii)   a failure to disclose facts the defendant had a duty to disclose;

(b)     The misrepresentation was factual and material to the transaction at issue;

(c)     The misrepresentation was made with either;

        (i)     intending the plaintiff to act on it; or

        (ii)    intending the plaintiff's reliance on the representation;

(d)     The plaintiff justifiably relied on the defendant's misrepresentation; and

(e)     The plaintiff's reliance on the defendant's misrepresentation caused the plaintiff to suffer damages.

91.     Defendants made repeated statements with the intent to deceive MPS and conceal the fact that they did not intend to pay MPS or abide by the terms of either West Agreement or the FFS Agreement.

92.     Defendants had the opportunity to deceive MPS and conceal the fact that they never intended to pay MPS its Residual Income because MPS and Defendants were Parties to certain Agent Agreements (the West Agreement and the

COMPLAINT AND DEMAND FOR JURY TRIAL

FFS Agreement). As parties with separate responsibilities in the same transactions, Defendants RB and West also accepted a fiduciary role with MPS to disclose all material facts related to those transactions.

93.     Further, Defendants had the opportunity to deceive MPS and conceal the fact that they never intended to pay MPS its Residual Income because OB and RB are father and son, FFS, Trio, West, and CML share employees, FFS, Trio, and West share the same office building, and Trio and West utilize the same address for their principal place of business.

94.     Likewise, Defendants had the motive to deceive MPS because FFS, Trio, West, and CML would recognize increased revenue through undercutting MPS and withholding MPS's Residual Income, and OB and RB would be afforded the opportunity to work on a joint venture together as father and son.

95.     MPS had no reason to know nor should it have known that Defendants were acting in concert with each other to aid in the breaches of each other's Agent Agreement with MPS and willfully withhold or otherwise misappropriate MPS's Residuals.

96.     MPS reasonably relied on Defendants' statements inducing him into the contract and Defendants' statements promising to pay MPS its Residual Income earned thereunder.

97.     MPS had no reason to know nor should it have known that Defendants

were acting in concert with each other to aid in the breaches of each other's Agent Agreement with MPS.

98.     After the nonpayment of the December 2022 Residuals, MPS specifically relied on OB's representations made, wherein OB "pointed the finger" at FFS's successor in interest and promised MPS would receive payment.

99.     After MPS conducted its own independent investigation and contacted the Acquirer Bank, it became clear to MPS that it had detrimentally relied on OB's assertions, OB had told the Acquirer Bank to withhold MPS's Residuals, and Defendants, and each of them, actively aided OB in concealing this truth.

100.    As a result of Defendants, and each of them, participating in the willful concealment of the other's intentional misrepresentations MPS has suffered damages in an amount no less than $193,593.25, or an amount to be determined according to proof at trial, plus attorneys' fees and costs.

### 6. Violations of H.R.S. § 480-2

### (Against FNBAB, FFS, Trio, West, and CML)

101.    MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

102.    Any unfair or deceptive act or practice in the conduct of any trade or commerce violates H.R.S. § 480-2. *Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 261 (2006).

103.   A deceptive act or practice, under Hawai'i's Deceptive Practices Act, is (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material. *Id*. at 262.

104.   A representation, omission, or practice is "material," under Hawai'i's Deceptive Practices Act, if it is likely to affect a consumer's choice. *Id*.

105.   A practice is "unfair," within the meaning of the Hawaii unfair or deceptive practices law, when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Balthazar v. Verizon Hawaii, Inc.*, 109 Hawai'i 69, 77 (2005)

106.   Defendants OB, FFS, RB, Trio, and West violated H.R.S. § 480-1 through acts of unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade or commerce. Their unlawful appropriation was made with the intent to deprive MPS of its property, undercut MPS from its duly owed residuals, and injure MPS's reputation and goodwill.

107.   MPS was an agent of Defendants OB and FFS, as well as RB and West, through which MPS sold merchant processing services on FFS's and West's behalf.

108.   Prior to entering into the Agent Agreements, OB and RB made misrepresentations regarding, among other things, West's and FFS's underwriting policies, the existence of West, FFS, and Trio as separate entities, the existence of

OB's separate duties to FFS, the existence of RB's separate duties to Trio, and the existence of RB's separate duties to West.

109. In reliance on these representations, MPS entered into certain Agent Agreements with West and FFS.

110. To MPS's surprise, West and FFS, as well as Trio, were under common ownership and/or control and did not operate as separate companies with separate duties.

111. Through the aforementioned principal-agent relationships, Defendants OB, FFS, RB, Trio, and West deceived MPS and obtained MPS's consent to hold Residual Income produced from MPS's merchants on MPS's behalf. Specifically, Defendants RB and West told MPS it would receive Residual Income related to the processing activity of the Merchants it referred to West and FFS, when in fact, RB and OB knew they were going to misappropriate the monies for their own use. West and FFS have refused to return MPS's money.

112. Specifically, in or around November 2021, West and/or FFS made their first in a series of deceptive trade practices when they assigned their rights under the Agent Agreements to a third party without notice to MPS. Specifically, West assigned its rights under the West Agreement to FFS without notice to MPS.

113. In or around December 2022, MPS discovered FFS had also entered into an additional assignment of rights agreement with another third party. This

COMPLAINT AND DEMAND FOR JURY TRIAL

additional assignment is when MPS first discovered any assignment of rights as MPS did not receive its Residual Income duly owed from December 2022.

114.   In January 2023, MPS made its first in a series of demands for payment of its duly earned Residual Income, OB indicated to MPS that West and/or FFS was no longer under a duty to pay MPS its duly earned Residual Income.

115.   Thereafter, it came to MPS's attention that West may have been a shell or mere instrumentality through which OB, RB, Trio, and FFS conducted business. For example, OB communicated on West's behalf by using an "@ffsdatacorp.com" email address as well as a "@yahoo.com" email address, MPS discovered Trio and West shared the same principal place of business as an address, and Trio, West, and FFS all utilized the same employee, Ms. Lambert, who began using CML Management, LLC in her email signature in all future communications with MPS.

116.   From January 2023, through March 2023, MPS exchanged several emails with Ms. Lambert, CML, OB, FFS, RB, and Trio asserting that none of each other had custody or control of MPS's Residual Compensation.

117.   Specifically, on February 8, 2023, OB stated, "I did talk to the bank and the bank released the rest of the funds today to pay their agents …I have no control over them."

118.   Thereafter, after not receiving the funds, MPS sought additional reassurances that it would receive its Residual Compensation.

COMPLAINT AND DEMAND FOR JURY TRIAL

119.   On January 27, 2023, MPS received an email from Ms. Lambert "All FFS Data Corp existing agent offices, payment of residuals has been delayed … Fiserv has sent payments to Bank of Albany. However, the funds were deposited in an account held by FFS/Olan Beard. FFS/Olan Bear has not released the funds."

120.   On February 9, 2023, MPS stated to OB, "Once again, we did not receive the funds promised … Who controls the funds?" To which, OB responded, "The bank has a hold on the funds. But I did get the bank to release the funds to pay all agents. But, [the third party successor in interest] IS holding $200,000.00 of funds saying it was previous months processing. I did get from the bank that [the third party successor in interest] paid everyone but you."

121.   In or around this same time, February 2023, MPS began receiving emails from Ms. Lambert's "@ffsdatacorp.com" email address. However, now, Ms. Lambert had "CML Management LLC" as her email signature, and Ms. Lambert and CML were continuing to aid OB's, FFS's, RB's, West's, and Trio's deceptive trade practices, stating "Unfortunately, I am not in the loop since the payments will be coming from [the third party successor in interest] from now on. I have reached out to everyone I know to get information for you. I am sorry, I do know they plan on getting you the payment I just cannot say when." From then forward, all subsequent communications from Ms. Lambert suddenly contained the "CML Management" email signature but still came from the "@ffsdatacorp.com" email

COMPLAINT AND DEMAND FOR JURY TRIAL

address.

122. On February 21, 2023, OB retracted that statement, and said, "I heard that another agent did not get paid."

123. By March 9, 2023, when MPS still had not received its Residual Compensation, MPS again asked OB and FFS to release the funds and stated, "I received [the third party successor in interest's] approval this morning…Again, I ask you to authorize FNB to release the funds to MPS directly."

124. The aforementioned misrepresentations, acts, and/or omissions violate the spirit of H.R.S. § 480-2 and constitute the use of corporate entities for something other than their lawful purpose.

125. MPS has suffered damages due to Defendants OB's, FFS's, RB's, Trio's, and West's deceptive and unfair trade practices. As a result of this malicious, intentional, unfair behavior, MPS is entitled to additional statutory and punitive damages according to proof at trial.

### 7. Conspiracy to Commit Conversion and Civil Theft

### (Against OB, FFS, Trio, CML, and Ms. Lambert)

126. MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

127. A conspiracy arises where two or more persons or entities, by concerted action, purport to accomplish a criminal or unlawful purpose.

128. Defendants OB, FFS, Trio, CML, and Ms. Lambert joined together with RB and West to accomplish an unlawful purpose. They had a meeting of the minds on the object or course of action. RB and West committed unlawful and overt acts to further that objective. Specifically, RB and West withheld money from MPS at the direction of and benefit to OB, FFS, Trio, CML, and Ms. Lambert, including but not limited to $193,593.25 in Residual Income.

129. MPS has been injured as a result of these Defendants' actions.

### 8. Conversion and Civil Theft

### (Against All Defendants)

130. MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

131. To prove a claim for conversion, a plaintiff must prove their ownership or right to possession of identifiable property, the defendant's conversion by wrongful acts inconsistent with the property rights of the plaintiff, and damages proximately caused thereto.

132. A defendant's wrongful exertion of control over another's property may be shown through:

(a) A taking from the owner without their consent;

(b) An unwarranted assumption of ownership;

(c) An illegal use or abuse of the chattel; or

(d)    A wrongful detention after demand.

133.    MPS owned and had the right to possess certain Residuals that were to be segregated from other funds.

134.    Defendants, and each of them, have taken control of MPS's Residuals without MPS's consent and, even after demand of payment, Defendants have wrongfully detained those Residuals.

135.    Defendants' actions, and each of them, have directly and proximately caused and continue to cause actual and consequential damages to MPS to the amount of no less than $193,593.25, or an amount to be determined according to proof at trial, plus attorneys' fees and costs.

### *9. Tortious Interference with Prospective Economic Advantage*

### (Against All Defendants)

136.    MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

137.    MPS has had prospective business advantages and/or prospective business expectations sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of these prospective business advantages and/or prospective business expectancies maturing into a future economic benefit to MPS. Such prospective business advantages and/or prospective business expectancies include MPS's sale and purveyance of Merchant Services, including

COMPLAINT AND DEMAND FOR JURY TRIAL

but not limited to credit card processing and ACH processing transactions for merchants across Hawai'i, the continental United States, and internationally.

138. At all relevant times, Defendants, and each of them, are and have been aware of MPS's prospective business relationships, advantages, and/or expectancies alleged herein.

139. Defendants, and each of them, had a purposeful intent to interfere with these valid business relationships and/or prospective business advantages and/or prospective business expectancies and, by its conduct alleged in this complaint, including, among other things, misrepresenting the quality of their underwriting policies, Defendants, and each of them, did, in fact, interfere with and impair these relationships. Specifically, OB and RB have been responsible for implementing the objective of this intent, the Entity Defendants were the instrumentalities through which they achieved their goals, and Ms. Lambert was a shared employee of RB and OB acting for the benefit of OB, RB, and the Entity Defendants.

140. Each Defendants' interference was without proper justification. As alleged herein, Defendants' interference and conduct with respect to dealing with MPS and misrepresenting the quality of their underwriting practices has been tortious, illegal, and in violation of statutes, regulations, common-law rules, and established trade standards.

141. Each Defendants' interference caused the third parties to fail to

consummate the prospective business relationships with MPS.

142. As a direct and proximate result of the foregoing intentional interference by Defendants, and each of them, MPS has been injured and was and will, sustain actual, special, general, consequential, compensatory, and other damages in such amounts that shall be proved at trial, including but not limited to $400,000.00 in lost monthly merchant processing volume.

143. Each Defendants' acts and conduct are intentional, willful, malicious, and in conscious disregard of the right and interests of MPS, entitling MPS to punitive and/or exemplary damages.

## 10. Constructive Trust and Request for Disgorgement

### (Against All Defendants)

144. MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

145. In addition, or in the alternative, MPS seeks to impose a constructive trust upon all funds and property, whether real or personal, gained through Defendants' breaches of fiduciary duty and other actionable conduct by Defendants. It is well-settled under Texas law that whenever one person has wrongfully taken the property of another and converted it into a new form or transferred it, a trust arises and follows the property or proceeds attributable to the property.

146. Defendants breached their fiduciary duties to MPS, and they have been

unjustly enriched as a result. It is possible to trace the funds stolen by Defendants to Defendants' personal and business accounts. Thus, MPS is entitled to a trust over the funds Defendants illegally obtained.

147. Additionally, RB and West must disgorge all profits or benefits received by him as a result of their illegal conduct.

### 11. Money Had & Received

### (Against OB and FFS)

148. MPS repeats, realleges, and incorporates by reference the paragraphs above with the same force and effect as if fully set forth herein.

149. To establish a claim for money had and received, a plaintiff must show the defendant has possession of the money of the plaintiff, which in equity and good conscience they ought to pay over.

150. Defendants OB and FFS hold money that in equity and good conscience belongs to MPS. Specifically, OB and FFS have possession or control of MPS Residuals.

151. Defendants' failure to return such monies has caused MPS harm.

### 12. Attorneys' Fees

### (Against All Defendants)

152. MPS repeats, realleges, and incorporates by reference the paragraphs set forth above with the same force and effect as if fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

153.    As a result of the actions complained of herein, MPS has been required to employ the law firm of DiPasquale & Summers to pursue the relief requested in this Complaint and Demand for Jury Trial. Plaintiff seeks recovery of all reasonable and necessary attorneys' fees, expenses, and court costs incurred in this action against Defendants in accordance with Section 18 of the West Agreement and Section 8 of the FFS Agreement.

## *13. Declaratory Relief*

### **(Against All Defendants)**

154.    MPS repeats, realleges, and incorporates by reference the paragraphs set forth above with the same force and effect as if fully set forth herein.

155.    A claim for declaratory relief arises where a party can prove:

(a)     A proper subject of declaratory relief; and

(b)     An actual controversy involving justiciable questions relating to the party's rights or obligations.

156.    An actual controversy involving justiciable questions of the Agent Agreements exists over which forum is best situated to hear the claims contained herein.

157.    As a result of the actions complained of herein, MPS has been required to employ the law firm of DiPasquale & Summers to pursue the relief requested in this Complaint and Demand for Jury Trial. There is a genuine dispute as to which

State's laws should apply and which State should adjudicate the issues herein because the Agent Agreements contain differing choices of law, jurisdiction, and venue provisions. Specifically, the West Agreement requires claims to be adjudicated in Taylor County, Texas, and the FFS agreement requires claims to be adjudicated in Hawaii's First Circuit.

158. Defendants, and each of them, ignored their obligations set forth under the Agent Agreements and acted in concert with, and to the benefit of, each other when West fraudulently assigned its rights under the West Agreement to FFS. In light of Defendants' concerted actions concealing and intentionally omitting any notice of the assignment of the rights from West to FFS, and in the interest of judicial efficiency, MPS seeks relief from having to maintain two separate actions related to the same transaction or occurrence. MPS also seeks relief from having to oppose any potential motions seeking to forum shop or adjudicate the validity of each forum selection clause. Instead, MPS seeks to adjudicate the merits of Defendants' concerted actions within one action.

159. MPS contends that the FFS Agreement supersedes the West Agreement as the FFS Agreement was the subsequently formed contract.

160. The FFS Agreement includes a Hawaii Choice of Law provision according to section 18, and a Hawaii jurisdictional provision pursuant to section 23.

161. MPS respectfully requests this Court render declaratory judgment on

any issues related to MPS's and Defendants' obligations pursuant to the forum selection clauses contained in the Agent Agreements.

## VI. <u>PRAYER</u>

MPS respectfully prays that the Court grant a judgment against Defendants for each of the following:

a.　　Judgment upon the causes of action pled herein against Defendants;

b.　　That MPS be awarded damages it has suffered against Defendants, in an amount to be determined according to proof;

c.　　An accounting from Defendants describing the revenue derived from Defendants' breaches and misappropriations;

d.　　That MPS be awarded treble damages pursuant to H.R.S. §§ 480-13(b)(1);

e.　　A judgment against Defendants for MPS's reasonable attorneys' fees and expenses pursuant to H.R.S. § 480-13(b)(1), and contract;

f.　　That MPS be awarded prejudgment and postjudgment interest;

g.　　That MPS be awarded exemplary and punitive damages against Defendants, in an amount to be determined at trial;

h.　　Judgment against Defendant for all costs of Court; and

i.　　For all other relief to which MPS may be legally or equitably entitled.

# VII. DEMAND TO PRESERVE EVIDENCE

1.    Plaintiff Merchant Payment Solutions demands that Defendants, and/or their counsel preserve all physical and electronic information pertaining in any way to:

    (a)    Plaintiff's causes of action and/or prayer for relief;

    (b)    Any defenses to the same;

    (c)    Plaintiff's alleged injuries; and

    (d)    Pertaining to any party, including but not limited to, electronic data storage, closed circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spreadsheets, financial statements, memos, text messages, and any and all online social-related websites, entries on social networking sites (including, but not limited to Google+, Facebook, Twitter, MySpace, LinkedIn, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

2.    Failure to do so will result in Plaintiff Merchant Payment Solutions asserting separate claims for spoliation of evidence and/or for appropriate adverse interference charges/jury instructions.

Dated:      Honolulu, HI
              October 30, 2023

**DIPASQUALE & SUMMERS, LLP**
*Attorneys for Plaintiff*

By:   */s/ James D. DiPasquale, Esq.*

James D. DiPasquale, #11033